acts and claims at issue in this case. I think it's important to start with two broad principles that cut across all three claims and I think have to inform the court's decision on all three issues. So the first is that the strong and overwhelming default rule is that government cannot compel association or subsidization absent what the Supreme Court has called extraordinary circumstances. The courts quoted Jefferson several times who said to compel a man to make a decision of opinions which he disbelieves is sinful and tyrannical. So first big principle, because compelled funding and association is the exception and not the norm, the Supreme Court is clear that if there's any ambiguity, if it's close, the court has to err on the side of protecting the First Amendment rights because of course the bar has no First Amendment right to anyone's money or association but my clients have significant speech and association rights in their own freedom of expression and association and conscience. Number two, the second big principle, I think the court needs to keep in mind the fundamental reason why we allow arrangements like this at all and Lathrop tells us and Keller tells us and Harris tells us, it's because law is a regulated profession and so as the court said in Harris, it makes sense that lawyers rather than the public bear the cost of a regulatory and disciplinary apparatus. That makes total sense. But once you go beyond that, it starts to stretch any link between that interest and the question has to be why are lawyers alone responsible for funding this versus why is this something that couldn't be funded through the general Fisk or through voluntary contributions. So I think those two principles inform each of the three claims we have here. So turning to our plot. How many states do it the other way? I believe there's a few that are a little ambiguous. I think it's about 30, 20 doing it the way Texas does. So starting with count one, in Keller, the Supreme Court expressly left open the question of if a bar engages in political and ideological activities beyond regulation of lawyers, can you be compelled to associate with them at all? Very explicitly, very explicitly an open question and Texas law forces my clients to join, fund and associate with an organization that is engaged in all sorts of controversial policy debates and advocacy. Mr. Harris, beyond joining and funding, what what else does Texas require of your clients by the way in way of association? I get it that they have to join it. I get it that they have to fund it. Anything else? I think the key on the association point is when the bar speaks on matters like legislation, like immigration, like race, they're using the imprimatur of the legal profession to suggest this is this is a formal organization. This is the views of the legal profession. This is a big deal because lawyers are supporting it. And so I think that's the key to this first claim, this association piece. So it's my members don't support or my my my clients don't support a lot of this stuff, so they don't want. Right. And the way I see your claim is is is if the bar is engaged in some sort of wholesale ideological project, somebody might come to your client and say, hey, I heard the bar was doing X. Aren't you a member? Absolutely. In your view, is that enough to create an association claim, assuming that the bar is actually doing what you claim? Absolutely. The Ninth Circuit just addressed this pro case last week and in pro. And I it's more about the message here than the money. So in pro, the bar had a screed against President Trump in one of its newsletters. And the the objector said, I don't I don't really want to be associated with that. And the Ninth Circuit just held in pro last week that that was enough to state a claim and move forward on an association. And I think I think it's the same here. I mean, when you look at marriage, race, immigration, I mean, it's hard to think of three issues that are more at the center of the public debate, more subject to strong views on all sides. And the bar is right in the middle of all of them. And again, I would just underscore pro, we think, gets it right on this. The the district court and the bar argue that Keller and Lathrop foreclosed this, but Keller couldn't have foreclosed it because Keller expressly said that this type of issue was an open issue. So I think and then when you move to when you move on, we accept the interest in Keller. We we take the the interest as articulated by the Supreme Court because it's Supreme Court precedent. But even if you accept those interests, there's a significant lack of tailoring here. So in McCullen, which we cite in our brief, the Supreme Court was clear that it's not enough just to say it's easier this way, it's more efficient this way. They have to show that there would be some impediment to achieving the same goals. And when you look at those 20 states that have voluntary associations, New York, Illinois, Pennsylvania, first of all, a every one of those states, they have robust voluntary associations that do lobbying and access to justice and programs and things for law students and sections. They do all of the same types of things that the Texas bar does, except they're funded voluntarily through people's own choices. And second, even more to the point, I'm not aware of any suggestion from the bar or otherwise, that lawyers in those states are not as well regulated as those in states that do an integrated system. So I think when you when you move to any sort of tailoring analysis, even if you accept the Keller interests, I think that we have a serious tailoring problem here. So moving on to what we call, so that's our count one, which says we think that they do enough political activities that we shouldn't be compelled to join or associate at all. Then our count two is saying, accepting the Keller framework, they do a lot of things that at the very least, we shouldn't have to pay for. And so Harris is the Supreme Court's most recent word on this. And the bar has a little bit of a complicated relationship with Harris. I mean, they love Harris, because Harris says that Keller is still good law, which again, we accept. But then Harris characterizes Keller, and it says, political and ideological activities are out. And the bar can only do with coerced dues, things like ethical codes or disciplinary matters. So these core again, going back to what I said at the start, why do we allow disarrangement at all? It's to regulate the profession. And in Harris's and let me go into an area you haven't touched on yet, as I understand it, but correct me if I misunderstand. You object to the state bars doing anything in the legislative field, that is to say endorsing or opposing any particular legislation. I don't understand that under the test that you just articulated. And I realize this is only one of the sub-issues in the case. But it seems to me perfectly reasonable for there to be some legislative efforts either proposing or opposing that would legitimately fit within the regulation of law. An example might be, I understand there's a pending effort possibly to redistrict the 14 state courts of appeals during the current legislative session. That strikes me as something that's not ideological. There may be those who oppose it and those who propose it. And the folks in Eastland may not want to lose their court of appeals, and I understand that. But why isn't that a legitimate sphere for the bar to get involved in, in terms of the legitimate administration of justice? Your Honor, we think of, we agree that there are some hard lines and some very close calls. We think the best view is that lobbying or political activity has to just be, if it's happening, it has to be separate or funded voluntarily. And what I'll point you to is, in the union context and in Keller, the Supreme Court told us that this context is highly and substantially analogous. So the Supreme Court itself said, look to those cases. Going back to the fifties, the Supreme Court has never allowed unions to use objectors funds to lobby. And even if you look at Knox, if you look at Leonard. So your position over here, your position is categorical bright line that any and all legislative advocacy would be non-germane to regulating and improving the practice of law. We take, we take the view that lobbying for the passage or defeat of legislation, we would urge a bright line that that just has to be. Well, you know, I mean, often people go to the legislature and you sign up to testify. Are you, are you going to be shown as for or against a bill? And a lot of people are there not to lobby. I'm using air quotes for the people who are not to lobby, but to provide information there. There is a neutral witness, neither advocating nor opposing a bill, just providing information to be helpful to lawmakers. We, we, we conceded in our brief, we have, um, uh, we've acknowledged that in its capacity as the regulator of the profession, we have no objection to giving information to responding to requests, but we think that's a far cry from what's happening with a lot of this stuff. Or let me talk about the accident. Wait, wait. So you think that bar officials can appear before legislative committees, offer testimony, just informational testimony, but they crossed the line when they veer into outright advocacy or opposition of proposed legislation? Yes. And, and, and again, and I do think when you look at their legislative program, it has a list of 30 some bills and it says, this is the program. These are the bills that the bar wants the people or the legislature to adopt. And so again, in its capacity as regulator of the profession, we understand that like any agency, there would be some back and forth with the legislature, but I think that's a category difference or the access to justice commission, the access to justice commission, just to be crystal clear about what it does, it gets an $800,000 grant from the bar and then it lobbies for more legal aid. And so to get to judge Smith's point, I mean, I think that you, yes, you can think of a world where that is related to the legal profession, but the Supreme Court, again, in every one of these cases says matters like the size and scope of government, government spending, government budgets, that's as political as it gets. And so we think when you read Harris in combined with a booed and Leonard and Hanson and street and all these cases, we think the line has to be lobbying is not germane. What kind of, what kind of record do we need and what measure of detail, um, to assess whether an expenditure is germane or not? Right. So we, um, and we all along we've worked cooperatively. Um, I think as Judge Yackel said with them, we, we basically have an undisputed record. I think, um, we all agree what the bar is doing. We just think there are different inferences from what you draw from it. So I don't, I don't think there are factual disputes or anything. And we would say that any expenditures on lobbying legislation has to be out. Um, and, and I'd also note one, one argument that my friends make is they actually try to distance themselves from the lobbying and say, well, it's mostly done by the sections or it's done by members, not by, except a couple issues with that. So first of all, access to justice commission lobbies directly for more government spending. And then in the bars, um, discipline or in the bars manual at ROA 4128, it says that the government relations department oversee and manage this lobbying program. So even if, even if it's not the bar that is going to the legislature saying to pass this bill, they're certainly using funds that my member, my clients object to, to advance this agenda. Well, the board, the board of directors has recently as September, probably even more recently than that has endorsed certain pending legislation, right? I'm sorry, I didn't hear that. The state bar board of directors has endorsed even very recently certain, certain legislation. So we, we don't have to speculate about whether they're doing it directly or through access to justice. Exactly. And, and I think it's also important to note one other thing that Knox is clear on, whatever germaneness means, it has to have a limiting principle and there is no limiting principle in either the decision of below or the bars brief. I mean, they, they say the state can lobby about the definition of marriage and the Texas constitution to address unconstitutional laws. And if, if that's the principle, that's just, that's no principle at all. That just means that they can engage in law reform or substantive changes to law with no limits because it pertains to clearing up the law or I think they say cleaning up legal texts, which I just, I don't see that even in the ballpark. Well, it seems to me that, that, that, that both sides in this case lose credibility on the all or nothing definition as it comes, as it, as it pertains to legislation. I think your position is, is, is untenable that no lobbying or endorsement of legislation is permissible, but I think theirs is equally untenable when they claim that absolutely nothing they have ever done in the legislative field crosses the line to ideology and, and politics. And we would say to that, your honor, I think we just go back to the first principle I started with, which is yes, you can certainly think of bills where it pertains to the legal profession, but even those, even those can be controversial or take, take the classic one of how should judges be paid? Should judges be elected or appointed? My members wouldn't want the bar to be lobbying. The Supreme Court hasn't said anything about what, what's controversial and what isn't. The example I gave me is probably controversial for the 14 districts across the state, but it's not the sort of, of ideological, uh, sensitive public policy oriented type, uh, uh, issue that the Supreme Court has identified. No, but and, and again, and I would just, and I would just repeat, um, that I think, I agree there'll be judgment calls. I agree there are ones that, um, it looks like it's more, it's closer to the profession or it's more in line with the regulator, but I just go back to where, where we started, which was Knox and that whole line of Abood cases is clear that if there are judgment calls or hard cases at the margins, the court needs to err on the side of, of protecting the first. Well, do you have an intermediate position? Uh, let's assume that the, that we think that the sort of all or nothing position that Judge Smith is, is talking about is not tenable. Do you have a fallback intermediate position that would help us distinguish, um, political idea, ideological that it's okay because it somehow has to do with regulating the legal profession and those that are not? Because I can equally imagine political lobbying that respects the legal profession that is ideological. There's gotta be some of that. So do you have, what, do you have a view? I think, I think Your Honor just said it. I mean, again, I think if, if any lobbying is going to be of the profession and respectfully, we don't think that things like grandparent visitation rights or the definition of marriage or, um, or again, even we, and we think even within the components of regulating the profession, there are some things such as we would say lobbying for more government spending. That's just too far. What about something like legislation respecting attorney advertising? How would we approach that? That's obviously regulating the profession. It's deeply My, my first answer to that would be it should be out because even lawyers of good faith could disagree with that. And so the bar shouldn't be lobbying on it. My backup would be, again, if there's going to be, if there's going to be a line, it should be what pertains to regulating the profession as opposed to cleaning up the law or, you know, changing what the bar thinks are unconstitutional laws. Um, so if I could, if I could briefly, um, talk about the access to justice piece of this. So few, few things are more intertwined with associational and expressive rights than what causes you support, what charities you give to, what funds you make. Um, and so our, our request is pretty simple, which is that on these things like access to justice and legal aid and pro bono, we just, we think that my clients and bar members should have a right to decide for themselves how to spend their resources rather than have the bar be choosing their causes for them. And so the question, the question is not just, is this a worthy cause? Is this a good idea? Is this something that should be getting money? The question is, why should bar members alone be compelled to fund this versus the general fund versus voluntary contributions? They have several declarations in the record that boast about how much funding the millions of dollars that people have voluntarily contributed to these efforts. Um, and so I was talking to Mr. McDonald, one of my clients just before this argument, and he, he reiterated that he passionately believes in access to justice. He does tons of pro bono work. He does low fee work. He volunteers his time, but he wants to be picking where he devotes those efforts. He doesn't want the bar to be picking his efforts for picking those choices for him. And so just to be clear with the legal services fee, half of the legal services fee, and this is all in the access to justice brief, half of the legal services fee goes to the access to justice foundation, which then just makes grants to a number of groups. And so again, I'm not here to say that those aren't worthy causes, but I am here to say that there's much more need than supply of legal aid. And we think it should be up to each bar member to meet their pro bono and access to justice duties rather than the bar literally just taking money. And then the access to justice foundation decides how to parcel it out. So we always have to look at the broader principle of why is, why is this something that the bar should be doing rather than individuals doing? And then same thing, I would, I would make a similar point about the, the diversity programs. I mean, we think program after program after program, there's a lot of stuff the bar does that's targeted at particular genders or races or sexual orientations. And the court doesn't need to look farther than the Supreme court's decisions to see how controversial these things are. I mean, the chief justice and justice Thomas have written eloquently about why things should not be targeted based on race and justice Sotomayor has written eloquently about why it's fine to do so. But this is a matter of heated public debate and controversy. And if the bar wants to do these programs and run these initiatives, that's great, but it shouldn't be expecting all members to be paying for them out of compelled dues. And then the last thing I'll say with my few remaining minutes, or so just briefly on opt-in and opt-out when the court reads Abood and Knox, both of those are very clear that a simple rebate system like the bars offering here is not adequate. Both of those decisions say objectors shouldn't have to give essentially a no interest loan. It shouldn't be the objector's duty to comb through the books and have to fly spec everything and find it. I think there needs to be a clear disclosure of what's chargeable and what's not. And we think there needs to be an opt-in system, which Knox is pretty clear about because it's far too easy. I would draw the exact opposite inference than the bar. They seem to say, well, no one ever objects to anything. And so therefore it must be all okay. And we would exactly the opposite conclusion, which is that must mean that when you get a voluminous material that people aren't necessarily reading, there's going to be a lot of people. I find it hard to believe that not a single member of the bar objects to a single penny of their expenditures. But when you have a very long report and statement, people might not necessarily read that. But when it's, hey, would you like to opt in and make an additional contribution? People will have that option. But I don't think the default should be every penny gets charged and then forced members to opt out. So last thing I'll say, just to finish where I started, my clients have serious first amendment rights here. This is core expression and association. And as the Supreme Court said in Knox, an entity like a bar or union does not have a first amendment right to be to anyone else's money or association. And so if the court, I agree that there are hard judgment calls to make in here. But I think if the court sees a hard issue, it has to err on the side of protecting the first amendment rather than allowing money to be coerced. So unless there are further questions, I'll reserve the remaining time for a ball. Thank you, Mr. Harris. Thank you. All right. I believe you're taking 19 minutes. Is that is that right? Yes, sir. Yes, your honor. If you should take more than that, it's at Mr. Meisel's expense. You understand that. So I'll be in trouble, your honor. Yes, sir. Thank you. May it please the court. Tom Leatherberry, along with Mr. Pat Meisel, my partner on behalf of the Texas State Bar defendants. With the court's permission, I'd like to reset just a little bit and summarize the reasons for affirmance of Judge Yackel's thorough opinion. I certainly will address the court's questions. I know Mr. Meisel will back clean up and answer anything that I don't get to in my time. The district court's judgment should be affirmed because on this full summary judgment record, plaintiffs failed to raise a genuine issue of material fact to support any of their three claims. Plaintiffs count one challenge to the State Bar Act's requirement that they enroll and pay dues annually fails on this record under Keller and Lathrop. The Ninth Circuit's recent decision in Crow doesn't change that, as we discussed with the court in our 28-J brief that we filed on Saturday. The Ninth Circuit is the one court to find any opening for an associational claim, and it did so in the context of a 12B6 motion, not on a full summary judgment record. To your question, Judge Duncan, the Texas Bar's associational obligations are minimal. The State Bar Act requires members to join and pay dues annually. There's no other associational obligation. One doesn't have to participate in sections, meetings, committees. One can speak out as one wants to against the State Bar's position, so there's no impingement on speech either. Does Crow turn on that, meaning the obligation of or does Crow turn on the nature of the statement in that case where, as I understand it, you essentially have a statement that purports to be on behalf of the entire bar, and so that triggers this claim that was associational claim that wasn't covered in Lathrop. See what I'm saying? Yes, Your Honor, I do, and I think Crow is somewhat of a confusing opinion because when I last reread it this morning, there was one paragraph that talks about some sort of free-floating membership associational, sort of membership qua membership, and yet the court then goes on to hold that the problem with the associational claim is that the plaintiff claims that the Oregon State Bar was doing, was engaging in non-germane speech and non-germane activities under Keller, so it says a little bit of both. I submit to the court that the proper analysis really looks to whether or not there's any non-germane speech, and on this record, the bar proved as a matter of law that its activities were were all germane and its speech was all germane. Right, but back to the associational claim, which I understand is distinct from the germane, non-germane spending, so I read Keller because I think because Keller says this, is that there's a kind of associational claim that's broader than the one that was dealt with in Lathrop, and so there's something out there that's available, and the question is what is it? Crow thinks that the panel and Crow thinks that that threshold has been met. I take it it's because of the nature of the statement. I mean, am I reading the law wrong? Well, it's also the nature of the statement, which is nothing like anything on our record that the Texas State Bar does, Your Honor, and we can go through that in the particular programs that are challenged. I think Mr. Mizell will do that, but it goes to whether the speech is germane or non-germane under Keller. Does the speech have to do with either regulating the or improving the quality of legal services, the two compelling state interests recognized under Keller? So you're saying that the statement in Crow is just non-germane. The court had to assume it was non-germane under 12b-6. Right. Yes, Your Honor, and here we have a full summary judgment record with multi-page affidavits from the Executive Director of the Bar, the Executive Director of the Access to Justice Commission, the Director of the Governmental Relations Department of the Bar. I mean, if the Texas Bar put out a statement like the one in Crow, let's say we had the same facts, do you have a position on whether that implicates the associational claim that was left open in Lathrop? To that hypothetical, Your Honor, I don't really have an opinion. I think that it would be up to the parties to make the record on a summary judgment, if it weren't a 12b-6, and prove germaneness, lay out the facts about the statement, and then argue germaneness. Well, look, and I'm not trying to get you to comment on the nature of the statement. I read the statement as a nakedly political statement in Crow. Correct. I mean, I think that's fair to say. You or me, we might agree with it, maybe, but it's a nakedly political statement. So imagine that a bar association decides, you know, on the letterhead for every single thing we send out in the name of the bar, we're going to put Black Lives Matter on the letterhead. Does that raise an associational claim? I hear what you're saying, Your Honor. I think one thing that is clearly non-germane is partisan political commentary, partisan political campaign. Okay, we agree on that. And so that certainly is off the table, and that's why the one example in the Attorney General's brief doesn't really correspond to these circumstances, because the example, the hypothetical, was somebody could only get a driver's license if they paid $10 to the Republican Party. Obviously, that's a partisan political compelled expenditure. So I think it would be up to the parties to make the record on that. So let me just summarize on count two, which is the compelled expenditure, the compelled speech through payment of money and through the bar's expenditures. The count two challenge to selected programs and expenditures fails because the bar establishes a matter of law that all of the questioned programs are either reasonable or necessary to use the language from Keller to further one or both of the compelling state interests in regulating the legal profession or improving the quality of legal services. Plaintiffs essentially try to rewrite the Keller standard by terming things political or ideological, and that's not the Keller standard. And they exclude and really don't engage with what it means to improve the quality of legal services and that compelling state interest in Keller. And that's where it's up to the parties to make the record about what the bar is actually doing, what interest it serves, how it improves the quality of legal services available to Texans. How does it improve the quality of legal representation to Texans to endorse a bill that redefines marriage? Thank you for that question, Your Honor. If you look at the legislation that the plaintiffs point to, what that legislation tries to do is to conform Texas law to the U.S. Supreme Court's decision in Obergefell. But I'm sure you would agree with me that the Texas Constitution, which is very lengthy, has lots and lots of provisions in it that have not been updated and that surely do not conform in every respect to what the federal Congress has done or to what the Supreme Court or this Court have enunciated. I'm sure you understand that. Oh, yes, Your Honor. But the bar hasn't really felt it necessary. I mean, come on, let's be serious. This is an ideological position that the State Bar Board of Directors has expressed, and it's just a ruse to say that they're just trying to, as a matter of legal nicety and technicality, to conform this to what they believe the Supreme Court has said about the definition of marriage. Well, Your Honor, in the record, too, is, I mean, it's not what the bar believes, it's what the court has held. And in the record is the final judgment in the Texas same-sex marriage case, De Leon v. Perry, which, you know, executes the mandate of this court in that case and makes certain findings. And the State Bar, and particularly one section of the State Bar, was acting on what the law had been declared to be. And you're saying that it's not an ideologically charged issue once the Supreme Court has announced it, which, of course, we know, for example, in the abortion area, simply isn't true. Right, Your Honor. I am not saying it's not an ideologically charged issue. I completely agree with you. But that's not the test. The test is, is it germane to improving the quality of legal services in Texas? And Judge Yankel laid it out in his opinion. He said it is germane to the Texas, to conform Texas law to federal mandates and to the law that's been declared by the Supreme Court, not what the bar directors believe. It's what's been declared. And otherwise— Can you give us an example, not going as far as, for example, endorsing one presidential endorsing an ideological position that you think would cross the line? For example, a resolution stating that all illegal aliens should be given immediate and unconditional citizenship. Let's take that as an example. I hope you'll agree that that's a highly controverted, regardless of which side we might take on it, position. It's an ideological, political position. Suppose the bar took a position one way or the other regarding citizenship for illegal aliens. Would that be permissible in terms of what you call the administration of justice and legal representation to all Texans? Your Honor, I think that probably goes over the line. And I think the other examples that I can give— Okay, well, explain why it goes over the line. How does it not meet your test? Well, you know, the bar can try to argue that that's germane to the quality of legal services in Texas, but that would be a stretch. And that's the test. It's not whether it's political or ideological. It's is it germane to improving the quality of legal services in Texas? The other examples that we have from Keller are extreme examples. A nuclear freeze initiative and a gun control measure. Those were not germane to either compelling state interest in Keller. They marked the extreme end of the Keller spectrum. So under count two, they would fail, and the bar should not spend money, spend mandatory dues to endorse or propose those sorts of things. But the legislation that we're talking about is in a completely different category. Judge Yackel went through the importance of eliminating confusion in the law so that lawyers can accurately advise their clients about what the law is. And that was the genesis for the changes in the Texas Constitution, the Texas marriage statutes. What is the confusion? I can sort of understand the concept of technical conformity so that state law reads the same as what the Supreme Court has said. But using this particular example of the definition of marriage, what possible confusion is there since 2015 when Obergefell was announced? Well, if there's a country or conflicting Texas law in the book, there's always a risk of confusion, Your Honor. There's a risk of confusion that statutes could be enforced that have been declared invalid. There's a risk that government officials would act based on statutes that have been declared invalid. So the risk is there. That's the risk Judge Yackel accepted and saw, and that's the risk that justifies the germaneness of that particular bill that we've been talking about. Well, let's talk a little bit about, if you don't mind, Your Honors, about the Keller spectrum. And I think, you know, that's an area obviously rife with lots of questions and lots of gray areas. And the spectrum and the compelling state interests of germaneness to the quality of legal services and germaneness to the regulation of the profession may be somewhat broad standards, but as we've discussed, they're not limitless. And even though they may be broad standards, those are the standards that the U.S. Supreme Court has given us in Keller. It's not whether something is political or ideological. It's whether or not it's germane to one of those compelling state interests. And it's particularly the prong about the compelling state interest in improving the quality of legal services that plaintiffs really don't engage with in their briefing at all, because they want to redefine the Keller standard. And it's very, the facts about germaneness are laid out in the multiple affidavits that the Bar filed, affidavits from Mr. Apfel, Ms. Laney, who runs the, who's the Director of the Governmental Affairs Division, some in-house counsel, Mr. Henning, Mr. Krasny, and Ms. McAllister, the Executive Director of the Texas Access to Justice Commission, and also the Chair of the Legal Access Division of the State Bar. So I really commend that I'm looking at the language. I realize the Court sets out the extremes, which I'm not sure how helpful that is, but the Court does it. So at least we know what it thinks the extremes are. But it says something interesting in the decision right before that. It says, when it's talking about the hard cases, it says the distinction here is between where the Bar members or officials are acting essentially as professional advisors to those ultimately charged with the regulation of the legal profession. That seems to be in what the Court thinks is okay. Do you agree with that? I agree that that's certainly okay. And it contrasts that sharply with activities having political or ideological coloration. You know, so I mean, I read it as as saying, well, when the Bar is acting almost in a professional capacity, advising about, you know, codes of professional responsibility or lawyers' ethical obligations, or maybe even attorney advising, advertising, which is an example we used with the other side. I mean, why shouldn't I read it narrowly that way so that dues only go to sort of technical issues? That's my word, I know, not the Supreme Court's. Your Honor, I think the prong of germaneness to improving the quality of legal services is broader than simply being technical. Okay, so you're using the term improving legal services, and that does sound broader than what I'm saying. And I'm just, while I'm getting at it, we have to, we may have to make a decision about where, how to prefer which one or the other, and where do we look beyond, I understand that the preferences of your client, I get that, I understand the preferences of the other side. Where do we look to draw the line? Well, Your Honor, I think, I think, again, you look to the record and you look to the amicus briefs that were filed in terms of pointing out ethical obligations that. Well, can we be informed by all the union cases that talk about germaneness, the union cases? Do you agree that those are relevant, or do you? Well, certainly, certainly they were, certainly they were and have been relevant, Your Honor. We know, for example, though, that the interests that were served in those union cases that were recognized in a boot back in the 70s, and then that those interests did not hold up, and the court revisited that in Janus, and said those interests are not compelling state interests that justify requiring compelled expenditures, and not even . . . Well, yeah, I understand the ground has shifted, which puts us in a funny position, doesn't it? When the ground shifts under it, I mean, we still have to follow Keller. That's correct, Your Honor, and we know that because the Janus opinion, well, we know that from Harris, which was written by Justice Alito a couple of years before Janus. We know it from Joseph House. However, we know that investigations through the system of bail of certain jarchaus, and the line drawing is a very technical thing, and I'm bright for lots questions. Thank you. I'll yield to Mr. Mosel. Thank you. Thank you, Your Honors. Mr. Mosel. May it please the Court, Pat Mosel again for the State Bar Appellees. I'd like to focus on one issue and expound on both the Crow and Keller issue. Keller, when dealing with the various political issues that were being espoused in California in the 80s, reads like a who's who of progressive issues, none of which were tethered to either regulation or improvement of quality of services. Off the top of my head, gun control, nuclear proliferation, limited federal jurisdiction over busing, abortion, school prayer, limiting, and it wasn't necessarily progressive. On the other side of the spectrum, there was issues like limiting special education, automatic, you know, public right to special education, a whole host of issues that were pure political, pure ideological, and not tethered to the improvement of quality of legal services. You fast forward to last week in the Oregon Bar situation, you have the criticism of President Trump with respect to the Charlottesville issue, and in Crow, what you have, again on a 12B6 sort of standard, you have an expression on behalf of the Bar of Oregon on that issue, and I would just assert that what you have on this summary judgment record is a far cry from the Keller issues in the late 80s or even as recently as what the Bar is doing. We have a bar journal. We have letters to the editor in the bar journal, but we have a clear statement in the bar journal that says these are not the position of the bar or its members, and I think that's an important distinction. So, when we talk about... What about efforts by state bar directors to censure or limit the powers of the state bar president because of what he has made? There's nothing theoretical about that. That's actual action being proposed by state bar members of the board of directors withdrawn only because of the public statement of one of them. The legal counsel said this one might get you in trouble. You better not do it. Well, that happened after the summary judgment record that was in front of Judge Yackel, and so I will talk just generally. Well, it's all on your website. We can take judicial notice of all or most of it, and you know exactly what happened, and there's little dispute about the facts, so why don't you address it straight on? Yeah, I mean, I think that the bar has a right to have a discourse about what the right thing for its president to say and not say is, and it's no different than an internal, in my view, an internal discourse on what's appropriate for the conduct of a bar director. In the end of that program, as I understand it, I'm not well steeped in the facts of how that turned out, but very little, in fact, happened in terms of curtailing anyone's speech on any issue. That's because legal counsel told you that you shouldn't do it. It's not a good idea. Right. Well, I guess the point that I would like to stress is that the Keller spectrum is when it is not lobbying involved in the Keller spectrum between, you know, at the far extremes of gun control and nuclear proliferation. Those are, that's when it's not germane to the improvement of quality of legal services. If it is germane to the improvement of quality of legal services and or germane to, you know, ethical, regulatory type functions, you're going to still have politically and ideologically charged issues, but, and if I could take on this. Well, so the statements for which the state bar president was being criticized, statements that I believe were made before he became state bar president, whether they were or not, and he, and there was a, there was a motion made that almost passed to limit his powers because of that. How were those statements that he was criticized for germane to the rendering of legal services as opposed to purely his own political, uh, social or ideological point of view expressed as a private citizen? Well, I, I apologize. I am not, I, I, I, because it wasn't in the record that I was studying and prepping. I'm not, I'm not a detail, uh, uh, knowledgeable about what happened, but what I understand is that there, that there was no official action, um, that, that, and that curtailed any way. And, and as you've said, it was all long before he ever ran for state bar president. And so in the end, um, I, I don't think there is a similar pro letter that says, you know, on behalf of all the bar, we condemn president Trump, uh, for his statements, uh, in connection with Charlottesville. It's just a, you know, I mean, it, it turned down into the lack of a better phrase, a complete, um, non-statement from the bar in the end about, uh, you know, what happened and certainly nothing that would rise to the level of a, a, uh, improper forced association claim that, that somehow or another members of the bar being forced to associate with a bar, um, improperly under first amendment principles, because there was an internal discussion, um, a public internal discussion about whether a guy who had been elected to the bar made some statements a couple of years before that were inappropriate. Um, I, I, I want to, um, in that vein, um, Judge Smith, in terms of the, of the Obergefell, um, um, discussion, it, it, there is, um, certainly the potential for confusion. If somebody Googles the Constitution right now, and it's in, in the, in the bill failed, it was, it, it's still, um, in the, in the Constitution and, uh, in the, in the statute, um, that, that still, um, has this, uh, you know, held unconstitutional and then also held, um, specifically in the Western District, um, to have been struck. If somebody Googles that, and, and I don't mean a lawyer that knows that Ober, Obergefell has overruled it, but if a member of the public Googles it, looks at it, it, you know, you would see that it, that it's, um, that it's still, uh, that same-sex marriage is, is, is still banned in Texas. Well, here's a, I get that. Here's a different hypothetical. In, in our state of Louisiana, at least my state, um, we have a law, we have a, a statement in, I forget if it's in the Constitution or in the statutes, but it's, uh, it says, look, when, if Roe versus Wade is ever overruled, uh, Louisiana will regulate abortion. I'm sorry, you can't hear me? I'm sorry. So, and if I, if I lean over here, I'm violating some rule, I guarantee you, so I won't do it. Yeah. Uh, but you can do that. Um, if, if in Louisiana law, it says, look, if Roe v. Wade is ever overruled, we're going to regulate abortion. Okay. We're just, we're putting down a marker, right? Um, what if the bar says, look, that's confusing to people that might lead them to believe that Roe versus Wade doesn't apply in Louisiana or it doesn't apply with full force? How does that work on your spectrum? Is that okay for the bar to do that or not? It, it sounds different than what, what we've done. It's just wordsmithing and that. Um, and if, if, if you could argue a tether to Mr., Mr., Mr. Bisset, you, you need to stand in front of the microphone because we're, we, we, we record the arguments. You can hear me? I, I understand you're, you're, you're, you're doing fine. And for some reason, it's, it's just this side of the room. I, I, you know, the, from the two on this side, it, it, it turns out all right. Um, I, I, I, I wouldn't want to venture a guess with, with respect to the Louisiana statute because I'm, I'm just not familiar with it. Um, I, I do, um, would like to, um, very quickly in the very short time that I've got, um, um, defend the Access to Justice, um, program, um, which has been, um, you know, just the sort of, um, bald proposition that because it lobbies, um, for money specifically at the, at the direction of the Texas Supreme Court, that that is a per se violation because there, because in Janus and in the, in the, in the, in the public union, um, sector, that was one of the, um, factors. And I don't, I think it is a far cry to compare the nickels and dimes that they are scraping together for, um, for pro bono efforts, um, is a far cry from the bankruptcies that are resulting from public union, um, lobbying, uh, uh, for municipalities. And it's just a complete apples and orange, uh, uh, argument. And in that circumstance, I would just stress again that I don't think there's any question that with respect to Access to Justice and the programs that, that are, that are involved in that, that the, the increasing of pro bono services satisfies both the regulatory, um, obligation for lawyers in Texas, um, to, uh, to contribute to public service and . . . Just a couple of final points in rebuttal. So first of all, on the question of what does the improving the quality of legal services probably mean, you know, one thing that they are doing is, um, you know, helping lawyers who have an alcohol or drug problem. Something like that seems like a classic thing that still falls within the umbrella of protecting the public, regulating and improving the profession, and also, you know, making sure that someone who's suffering for some reason is able to, to elevate. So I think that's the sort of thing that would fall within that prong. So some of Judge Duncan's questions seem to be getting at what I think is a really important point of what happens if something is germane and also political and ideological. And our view is out. Like, you can't do that. And, and here's the best way to think of that. In a case like Knox, Prop 75 and Prop . . . So Proposition 76 would have limited state spending on public employees and would have given the governor the ability to cut state appropriations for public employees. This was in the heartland of why the union was representing these public employees. And the union said, this is the sort of thing we, we want to, justices Ginsburg and Sotomayor agreed that that was not chargeable. And not only was it not chargeable, but there had to be an advance opt-in. And so I think that's some, and, and Knox is, is applying a bood. It's, it's pre-Janus. It's consistent with Keller. And so we think on this question of if it's political ideological, but germane, we think it has to be out. And I think the way union lobbying was treated is a, is a helpful analogy to resolve those. Um, you know, Judge, Judge Smith asked the question about . . . I think, by the way, the, the clock is not working, Robert. You, you, you have three minutes left. Okay. Sure. Yeah. I'm, I'm almost done. Excuse the interruption, but that's okay. And in terms of what's coming down the pipeline, page 14 of our reply brief, we cite the incident that Judge Smith, um, asked Mr. Mazzell about. And Mr. Mazzell said, we would never do anything like California. They did all of this sort of outlandish stuff. That's nothing like anything we would do. So after this incident that Your Honor referred to, which is all on the BAR's website, um, they've proposed another task force on diversity, equity, and inclusion, um, mandating that the BAR's board complete implicit bias training, consider making implicit bias training an MCLE requirement for all Texas attorneys, and last of all, study whether to implement the highly controversial rule. This Model Rule 8.4 would basically restrict the speech of attorneys in order to prevent, um, offense or insensitivity. Highly controversial. Many religious liberty groups think that this would be used to prevent discussion of, um, um, issues pertaining to the family or religious liberty. So I think, you know, we, we cite all this on page 14 of our reply. We think this is the sort of agenda that would be coming down the pipeline, um, and we the court will, um, just to, to, to close where I started, all of the three claims that we raise are things that are expressly left open by the Supreme Court. Claim 1 was left open in Keller. In Claim 2, neither the Supreme Court nor this court has ever opined on any specific expense, so we think that's a question of first impression. In Claim 3, Keller itself said, what are the procedures you have to use? So we're offering the court, um, three questions of first impression, which we think should be resolved in light of the background understanding that the court needs to build a significant buffer around the First Amendment to ensure robust expression, uh, protection of these important, um, speech and association rights. All right. Thank you, Mr. Harris. Thank you. The case is under submission. Again, we appreciate participation of, of both sides and assisting us in hearing face-to-face arguments. Last case for today, Boudreaux.